

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00236-CR

CARLOS MARTINEZ                                                                          APPELLANT

V.

THE STATE OF TEXAS                                                                        STATE

----------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. F-2013-0742-D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Carlos Martinez appeals his conviction for delivery of a controlled substance causing serious bodily injury to a child.[2]  In two issues,

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Health & Safety Code Ann. §§ 481.122, 481.141 (West 2010).

Martinez argues (1) that the trial court abused its discretion by allowing the State to introduce the results of a urinalysis test performed on the minor complainant, S.C., when she was admitted into the hospital after an apparent overdose of heroin, and (2) that there is insufficient evidence to prove that the substance he delivered to S.C. was heroin. We will affirm.

## II. BACKGROUND

This case arose after two or three adult men picked up S.C. and her sister, C.C., near a McDonald's in Lake Dallas and took them to a nearby apartment in Lewisville. At the time, S.C. was fourteen years old and C.C. was fifteen. After a night of smoking marijuana and snorting a significant amount of a combination of heroin and Tylenol PM, emergency personnel eventually CareFlited S.C. to Medical City Children's Hospital in Dallas, where after receiving extensive medical treatment and remaining in a coma for days, S.C. awoke. The State indicted Martinez for the offense of delivery of a controlled substance, to-wit: heroin.

At trial, S.C. testified that on the evening of July 18, 2011, she and C.C. went to the McDonald's attempting to get a ride to Lewisville. When their ride did not show, the two girls began walking home. As they walked home, Jonathan Watson and Jessie Manzanares picked them up and drove them to an apartment in Lewisville. S.C. averred that when they arrived at the apartment around 9:30 p.m., Martinez, Julian Candelas and his girlfriend, Chelsea Sherwin, and another male whom S.C. was not familiar with were already there. Shortly after their

2

arrival, "[e]verybody" started smoking marijuana. S.C. testified that Martinez then retrieved "a plate of heroin [and] put[] it on the table." S.C. said that she knew it was heroin because she "had seen [heroin] before." She also said that her sister told her that it was heroin. S.C. described the heroin as "brownish." After Martinez placed the plate on the table, S.C. testified that he began making "lines" of "cheese," a mixture of heroin and Tylenol PM. S.C. described how Martinez utilized a credit card to make the lines "so [she] could snort it" by using a rolled-up dollar bill as a straw. By S.C.'s account, Martinez snorted a line, and then Manzanares snorted a line. S.C. said that she could not recall whether Martinez or Manzanares asked her if she wanted to snort a line herself, but when asked, she said "yes," Martinez prepared a line for her, and then she snorted it. In short order, S.C. said that "they did another line, and then [she] did another line." S.C. averred that Martinez prepared both lines of cheese that she remembers snorting. After snorting the two lines, S.C. said that she went to the restroom and then didn't remember anything after that until waking up in the hospital days later.

Sherwin testified that she, Candelas, Manzanares, and Martinez all went to the apartment on the evening of July 18, 2011. Sherwin said that Watson and Manzanares went to pick up S.C. and C.C., but she said that she and Candelas stayed at the apartment. Sherwin said that she and Candelas mostly remained in the bedroom while everyone else stayed in the living room. At one point in the evening, Sherwin said that as she went through the living room on her way to the kitchen, she saw a plate of "cheese" or heroin. Sherwin admitted that she was

3

quite familiar with heroin because Candelas was a user and had been using his own personal heroin in the bedroom that evening. Sherwin explained how she had witnessed Candelas multiple times prepare and snort cheese by making a line of it and snorting it through a "straw [or rolled-up] dollar bill." According to Sherwin, the plate of cheese she saw that night was "with" Martinez and S.C., who was sitting with him. Sherwin said that the plate of cheese, which she described as "[d]ark brown or tan" was "on their laps." Sherwin testified that she knew that S.C. was "high" on cheese because she had seen Candelas under the influence numerous times.

Sherwin went back to the bedroom, but later that night she went back through the living room again and could tell that there was less cheese on the plate than earlier. She asked Martinez whether S.C. was all right because S.C. appeared "really high" to Sherwin. Sherwin said that Martinez said, "That's how it makes you feel." Sherwin averred that she interpreted Martinez's statement to mean that S.C. was simply high on heroin. Sherwin then retired to the bedroom for the night.

Early the next morning, Martinez and Manzanares woke Sherwin and Candelas to inquire whether they wanted food from McDonald's. After Martinez and Manzanares returned with breakfast, Sherwin said that S.C. "wouldn't wake up." Sherwin said that C.C. started "freaking out" because S.C. would not awaken. Upon hearing the commotion, Sherwin went into the living room and said that S.C. looked "bluish, purplish." Sherwin believed that S.C. was dead.

4

After some of the guys attempted to awaken S.C. by soaking her with water, C.C. called 9-1-1 using someone else's phone. By Sherwin's account, she, Candelas, C.C., and S.C. stayed at the apartment awaiting emergency personnel, but everyone else left prior to their arrival because they were scared.

Steve Mason, a firefighter and paramedic for the City of Lewisville, arrived at the apartment as a first responder on the morning of July 19, 2011. Mason said that when he arrived, S.C. was unconscious, soaking wet, and "propped up" in the apartment's living room. Mason said that dispatch initially informed him that a person at the scene was simply unconscious, but "as we arrived, it was changed to an overdose." Mason described S.C. as being "unconscious, having [a] difficult time breathing, [and experiencing] snoring respirations." He added that S.C. was "not alert whatsoever." Sherwin said that he and other emergency personnel placed S.C. in an ambulance and intubated her. By Mason's account, he administered the drug Narcan to S.C.

Mason described Narcan as a drug used to override the effects of an opiate overdose, including heroin. Mason said that his initial treatment of S.C. was based on his training of gathering information at the scene when he arrived and that he perceived S.C. to be suffering an opiate overdose.

Manzanares testified that on July 18, 2011, he purchased heroin for himself, Candelas, and Martinez. Manzanares said that later that evening, he and some of the other guys went and picked up S.C. and C.C. and brought them back to the apartment. Manzanares said that he had done heroin numerous

5

times and that he typically mixed the heroin with sleeping pills, like Tylenol PM, to form "cheese" and then snorted it. He averred that this is the manner in which people at the apartment that evening were ingesting heroin. Much like other eyewitnesses who testified, Manzanares described how he and the others would snort lines of cheese that had been formed by using a credit card and also how the substance was snorted by using either a straw or rolled-up dollar bill.

According to Manzanares, he could not remember anyone other than himself, Candelas, and Martinez doing heroin that night, but when confronted with his statement to investigating officers, Manzanares acknowledged telling the investigating officers that Martinez gave heroin to S.C. Manzanares also admitted that he told the officers that Martinez possessed twice as much heroin as he or Candelas had that night. Much like Sherwin had stated, Manzanares averred that the next morning, after he retrieved breakfast, S.C. would not wake up and appeared blue in color. He testified that C.C. had used his phone to call 9-1-1 but that he left with Martinez before emergency responders arrived.

C.C. testified at trial as well. C.C. said that on July 18, 2011, Manzanares and another man met her and S.C. near McDonald's and drove them back to the apartment. According to C.C., after they arrived, everyone started smoking marijuana. Then, some of the guys began to prepare cheese. Much like other witnesses, C.C. explained how she had witnessed some of the guys mixing heroin with Tylenol PM and then preparing lines of the compound and snorting it. C.C. said that Martinez offered some of the cheese to S.C. and that S.C. partook

6

by snorting it as the others had done. C.C. said that S.C. initially snorted two to three lines but that as the night went on, S.C. continued to snort more lines, eventually snorting upwards of sixteen lines. Like other witnesses, C.C. retold how the next morning S.C. was unresponsive, purple in color, and making strange snoring sounds. C.C. testified that when she called 9-1-1, almost everyone left, including Martinez. When the paramedics arrived, C.C. informed them that S.C. had been snorting the compound of heroin and Tylenol PM.

The State also called two nurses involved in taking urine samples from S.C. once she was admitted into emergency care. During the nurses' testimony, the State introduced a lab report produced from a urinalysis machine, which indicated that S.C. had ingested opiates prior to her arrival at the hospital. The State also called two physicians who treated S.C. after her transport to the Lewisville Medical Center and eventual CareFlite to Medical City Children's Hospital in Dallas. The physicians' testimony is largely irrelevant to Martinez's issues on appeal, but the thrust of their testimony is that S.C. was within minutes of dying when C.C. called 9-1-1.

A jury convicted Martinez of the delivery of a controlled substance to a child. The jury also found true the charge's paragraph that Martinez caused serious bodily injury to S.C. The jury assessed punishment at forty years' incarceration. The trial court rendered judgment accordingly, and this appeal followed.

## III.  DISCUSSION

### A.     The Urinalysis Report

In his first issue, Martinez argues that the trial court abused its discretion by admitting into evidence the urinalysis report, which showed that S.C. had ingested opiates prior to being transported to the Lewisville Medical Center. Citing rules regarding the admissibility of scientific evidence, hearsay, due process, and his rights to confront witnesses under Texas and federal law, Martinez argues that the State failed to lay the proper predicate that would have allowed the trial court to admit the report into evidence.

### *1.      Confrontation Clause*

Although Martinez does not cite nor analyze cases pertaining to his right to confront witnesses against him, it appears that in part of his first issue Martinez is making a Confrontation Clause argument regarding the urinalysis report. *See Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004). We conclude, however, that the urinalysis report is not a testimonial statement for purposes of the Confrontation Clause because the report was produced during an emergency with its primary purpose being to diagnose the condition of S.C. upon arrival at the hospital. *See Vinson v. State*, 252 S.W.3d 336, 339–41 (Tex. Crim. App. 2008) (recognizing that statements made during an emergency are non-testimonial because they are not made primarily to develop facts for later litigation but to decide how to appropriately respond to the emergency). We overrule this portion of Martinez's first issue.

8

### 2. *Hearsay Within Hearsay and Due Process*

Martinez also appears to make hearsay within hearsay and due process arguments in his first issue, but his discussion and analysis based on these theories is even more scant than his Confrontation Clause argument. Even so, Martinez never made a due process argument in the trial court, and he readily admits that he did not pursue his hearsay within hearsay objection to a ruling in the trial court. Thus, Martinez failed to preserve any objections based on these theories for our review. *See* Tex. R. App. P. 33.1(a) (requiring specific objection and a *ruling* from the trial judge to preserve error for appellate purposes). We overrule these portions of Martinez's first issue.

### 3. *Introduction of the Urinalysis Report was Harmless*

Martinez dedicates the lion's share of his first issue to the notion that the State failed to lay a proper predicate to the admissibility of the urinalysis report. Specifically, Martinez argues that "the State was required to prove either that the *Kelly* criteria were satisfied or that the test performed by the machine in question had been subjected to a proper gatekeeping finding by the courts of this State and previously found reliable." *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see also Hernandez v. State*, 116 S.W.3d 26, 28–29 (Tex. Crim. App. 2003). We will assume without deciding that the trial court abused its discretion by admitting the urinalysis report, but we conclude that the admission of the report was harmless. *See Quinney v. State*, 99 S.W.3d 853, 860 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[T]he trial court's erroneous

9

admission of [scientific] evidence did not affect appellant's substantial rights and was harmless in light of other properly admitted evidence.").

Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by rule 44.2(b) if the trial court's ruling merely offends the rules of evidence. *See* Tex. R. App. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Walters v. State*, 247 S.W.3d 204, 222 (Tex. Crim. App. 2007) (determining that exclusion of evidence supporting defendant's defensive theory was nonconstitutional error). *But cf. Tiede v. State*, 76 S.W.3d 13, 14 (Tex. Crim. App. 2002) (giving two examples of evidentiary rulings excluding evidence that potentially rise to level of constitutional violations).

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (*citing Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the

10

case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

Here, viewing the record as a whole, we conclude that the admission of the urinalysis report, even if it was error, did not have a substantial and injurious effect or influence in determining the jury's verdict that Martinez delivered heroin to S.C. S.C. testified that she ingested heroin by snorting it after Martinez had offered it to her. She said that she was familiar with heroin, and she described its color and the manner in which Martinez prepared it for her. *See Bright v. State*, 556 S.W.2d 317, 322 (Tex. Crim. App. 1977), *overruled on other grounds*, *McClenan v. State*, 661 S.W.2d 108 (Tex. Crim. App. 1983) (holding that witness's testimony that appellant told him substance was heroin was admissible and probative of the substance's identity); *Roberts v. State*, 9 S.W.3d 460, 462–63 (Tex. App.—Austin 1999, no pet.) (testimony from minors that appellant sold them marijuana was some evidence that the substance was indeed marijuana, and their lack of training and the lack of chemical analysis on the substance went to the weight fact finder gave their testimony).

Sherwin also testified that she was very familiar with heroin and that she had seen heroin mixed with Tylenol PM on a plate in the laps of S.C. and Martinez as they sat together. Sherwin averred that she also was familiar with heroin's effects on the person who ingests it and that S.C. appeared to have

11

ingested heroin that night. Sherwin further testified that when she went back through the living room a second time, it looked as though Martinez and S.C. had consumed even more heroin than when she saw them the first time, so much so that Sherwin was concerned for S.C.'s well-being. According to Sherwin, Martinez acknowledged to Sherwin that S.C. was under the influence of heroin when he told her, "That's how it makes you feel."

C.C. testified that she witnessed Martinez offer heroin to S.C. and that she observed S.C. snort upwards of sixteen lines of the compound of heroin and Tylenol PM. Furthermore, Manzanares testified that he had purchased heroin that night for himself, Candelas, and Martinez. Manzanares admitted that he, Martinez, and Candelas ingested heroin that night. And even though Manzanares denied any knowledge of S.C. ingesting heroin, he admitted on the stand that he had previously told investigating officers that Martinez had twice as much heroin as the other two men and that Martinez had given S.C. heroin.

Moreover, Mason, the first responder to the 9-1-1 call, said that he treated S.C. with the drug Narcan, a drug designed to offset the effects of an opiate overdose, including heroin. By Mason's account, he treated S.C. for an opiate overdose based on the information he gathered when he arrived on the scene and based on S.C.'s signs and symptoms.

Additionally, multiple witnesses testified that Martinez and others left the apartment before officials could arrive because they were scared. *See Jackson v. State*, 643 S.W.2d 521, 523 (Tex. App.—Fort Worth 1982, pet. ref'd) ("Flight is

12

a circumstance that tends to show guilty consciousness."). And even though the State did mention the complained-of report when it sought to have it admitted and mentioned it again briefly in its final closing arguments, the State never focused on the report; instead, it focused on the volume of eyewitness testimony it had elicited at trial. Based on this record as a whole, we hold that even assuming it was error for the trial court to admit the complained-of urinalysis report, we have a fair assurance that its introduction into evidence did not influence the jury, or had but a slight effect on its verdict, and that its introduction did not affect Martinez's substantial rights. *See Land v. State*, 291 S.W.3d 23, 28 (Tex. App.—Texarkana 2009, pet. ref'd) ("The admission of inadmissible evidence becomes harmless error if other evidence proving the same fact is properly admitted elsewhere."). We overrule Martinez's first issue.

## B. Sufficiency of the Evidence that S.C. Ingested Heroin

In his second issue, Martinez argues that "[t]here is no proof within the record that any heroin was in the body of S.C." Martinez's specific argument is that because the urinalysis report that the State introduced indicated only that S.C. had ingested opiates, a general class, and not specifically heroin as described in the indictment, the State failed to provide sufficient evidence of the "controlled substance" element of the charge against him. *See* Tex. Health & Safety Code Ann. § 481.112(a) (West 2010). We disagree.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to

13

determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Furthermore, we must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

Viewing the evidence in the light most favorable to the verdict, as detailed above, multiple eyewitnesses testified that Martinez had heroin that night in the apartment, that he had offered it to S.C., that S.C. snorted it after Martinez prepared it for her, and that S.C. appeared to be under the influence of heroin. Moreover, Mason, the first responder to C.C.'s 9-1-1 call, testified that heroin is an opiate and that he treated S.C. for an opiate overdose based on his diagnosis upon arriving at the apartment. That diagnosis was confirmed by the lab report, which, even assuming it was erroneously admitted, we must consider in our review of this issue. See *Clayton*, 235 S.W.3d at 778. We conclude that based on this record as a whole, a rational trier of fact could have found beyond a reasonable doubt that the substance Martinez delivered to S.C. was in fact heroin. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Wise*, 364 S.W.3d at 903. Thus, we overrule Martinez's second issue.

## IV. CONCLUSION

Having overruled both of Martinez's issues on appeal, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 7, 2014